IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  11-cv-997-LTB-GPG

ROBERT W. BLEIL,

       Plaintiff,

v.

WILLIAMS PRODUCTION RMT COMPANY, LLC, a Delaware limited liability company, and
THE WILLIAMS COMPANIES, INC. SEVERANCE PAY PLAN, a welfare benefits plan,

       Defendants.

_____

## ORDER

_____

This matter is before me on the Motion for Summary Judgment and Supporting Brief filed by Defendants Williams Production RMT Company, LLC (the "Company")–now known as WPX Energy Rocky Mountain, LLC–and The Williams Companies, Inc. Severance Pay Plan (the "Severance Plan") **[Doc #55]**. After considering the parties' arguments, for the reasons below, I DENY the motion in part and GRANT it in part.

## I. Background

This action flows from the Company's termination of Plaintiff Robert Bleil. The following is undisputed unless otherwise noted.

The Company is a Delaware limited liability company with its principal place of business in Denver, Colorado. During 2007, 2008, and 2009, it was in the business of exploring for and producing oil and gas in the Piceance Basin in Western Colorado.

The Severance Plan is a welfare benefit plan governed by ERISA. The Company was a "Participant Company" under the terms of the Severance Plan, meaning that the Company's

employees could receive benefits under the Severance Plan if they were considered a "Participant" in it and satisfied other requirements.

Plaintiff began working for the Company in July 2005 as an at-will employee. He started as a senior environmental specialist in the Company's Parachute, Colorado, office. He later obtained the position of environmental team lead, and then he became an environmental manager in 2008. As an environmental manager, his responsibilities included developing, implementing, and monitoring administrative and environmental programs. He was also responsible for managing and supervising certain members of the environmental staff in the Parachute office who supported the Piceance Valley operations, supervising at times five employees. Plaintiff was also responsible for selecting certain contractors to perform services in the Piceance Valley and for overseeing their work.

While working for the Company, Plaintiff received several "Deferred Stock" or "Restricted Stock Unit Awards," which provided conditional grants of shares in the Company's stock (the "RSUs"). The grant of the RSUs was subject to the terms and conditions delineated in corresponding "Deferred Stock Agreement" or "Restricted Stock Unit Agreement" (singularly, an "Award Agreement," collectively, the "Award Agreements").

At all times pertinent to this action, the Company had a code of business conduct, which was published to employees. It contained the Company's core values and beliefs and a conflicts of interest policy. The code of business conduct contained the following language:

> Our core values represent a strong commitment to our investors, customers, employees and communities. We always want to act in the best interest of these stakeholders. Therefore, we all are expected to avoid or disclose any activity that may interfere, or have the appearance of interfering, with our responsibilities to Williams and its stakeholders. Activities that cannot be avoided must be disclosed to the immediate supervisor. That supervisor is responsible to establish and monitor

2

procedures that ensure Williams is not disadvantaged.

*       *       *

In regard to ourselves or a close relative or associate, a direct or indirect financial interest in any enterprise which does business with, or is a competitor of, Williams represents a potential conflict of interest and should be fully reported to our immediate supervisor.

Def.'s Mot. Ex. 3 at 11-12.  During the pertinent time period, the Company also had and published a conflict of interest standard, with which all employees were expected to comply.  *Id.* Ex. 4. Among other things, it provided that "[a]ll employees of the Company have a primary business responsibility to the Company and are expected to avoid or disclose any activity which may interfere, or have the appearance of interfering, with the performance of his responsibility."  *Id.* at 1. It also directed that "[i]n the event an employee senses that he may be involved in a conflict of interest, he should immediately report the matter to his or her supervisor, making a full disclosure of all pertinent circumstances."  *Id.* at 2.

In 2008, Plaintiff's direct supervisor, Michael Paules, identified several areas in which he believed Plaintiff needed to improve his job performance. *Id.* Ex. 64.  These included improving his communication style by being more persuasive than forceful, strengthening his working relationships with peers and governmental agencies, being more collaborative than controlling, and fostering a sense of integrity by building trust as opposed to suspicion with others. *Id.*  Paules discussed these areas of improvement with Plaintiff. *Id.*

In July or August 2009, Rick Matar, one of Plaintiff's co-workers at that time, became concerned that Plaintiff may have violated the Company's conflict of interest policies by unfairly favoring a contractor, HRL Compliance Solutions, Inc. ("HRL"), because HRL had hired Plaintiff's son. Matar reported his concern to Paules and to a Company human resource representative.  On or

about September 2, 2009, Bruce List, the Company's director of security, was informed of Matar's concern. Lists's responsibilities for the Company included investigating complaints of possible conflicts of interest.  He undertook an internal investigation.

In September of 2009, unaware that List had commenced his investigation, Paules learned that some of Plaintiff's colleagues and regulatory officials had raised concerns regarding Plaintiff's conduct.   One such concern was that Plaintiff had disobeyed a direct order. Paules drafted a written reprimand explaining these concerns, but after learning of Lists's investigation, he did not finalize or present the reprimand so as to the let investigation proceed. *See id.* Ex. 64, 66.

Next, on October 6, 2009, List met with Plaintiff and questioned him for the internal investigation.    At the beginning of this meeting, Plaintiff signed an "Investigation Acknowledgment," which stated, in part, that

> I understand that this investigation is to remain confidential, and I agree that I will not discuss this investigation with any person, other than those persons conducting the investigation. I understand that any information that I receive or provide within the investigation is to be kept strictly confidential, and I agree to not disclose to anyone the subject matter of content of this investigation.

> I understand that my maintaining the confidentiality of this investigation process is a condition of my continued employment. I acknowledge that my failure to maintain confidentiality of this investigation could result in disciplinary action against me, up to and including termination.

*See* Def.'s Mot. Ex. 33.  After signing the Investigation Acknowledgment, Plaintiff discussed the investigation with multiple co-workers.  In addition to interviewing Plaintiff, List also interviewed numerous other witnesses and reviewed documents supplied by Plaintiff and others.

From his investigation, List concluded the following. First, Plaintiff violated the Company's conflict of interest policy by not disclosing to his supervisor that his son was employed as a summer intern for HRL, over which Plaintiff had some oversight for sales, work, and invoice approval. *See*

4

*Id.* Ex. 69 at 3. Second, Plaintiff engaged in a conflict of interest by hiring his daughter as a contractor to perform work in his area of responsibility without proper disclosure and approval. *Id.* Third, Plaintiff approved conflicts of interest involving two of his employees who hired their relatives as contractors and allowed them to provide direct supervision of their relatives. *Id.* Fourth, Plaintiff engaged in a conflict of interest by having one of the Company's contractors perform services at his personal property in August 2008, and Plaintiff had not been billed nor had he paid for the services. *Id.* Fifth, Plaintiff violated Company policy by failing to adhere to directives not to disclose or discuss the investigation with coworkers. *Id.* Sixth, there was no evidence that Plaintiff gave HRL work that was unnecessary or for which it was unqualified. *Id.* at 4. List detailed these findings in a reported dated October 30, 2009, and presented them to Paules and Alan Harrison, the Company's Piceance Basin vice president.

After being apprised of Lists's findings, Harrison and Paules agreed to discharge Plaintiff. Harrison explained that his decision to dismiss Plaintiff was based primarily upon Plaintiff's violation of the Investigation Agreement, which Harrison viewed as a willful or reckless disregard of a published policy. Def.'s Mot. Ex. 1 at ¶ 4. Paules explained that he reached his decision to terminate Plaintiff based upon the findings from Lists's investigation and Plaintiff's performance deficiencies that he discussed with Plaintiff in 2008 and had documented in the reprimand the month before. *See id.* Ex. 64 at ¶¶ 2-4. Paules believed that some of Plaintiff's conduct constituted willful or reckless violations or disregard of the Company's code of business conduct and policies.

On November 3, 2009, Plaintiff was terminated for "gross misconduct." *Id.* Ex. 67. That day Paules presented Plaintiff with a memorandum summarizing the reasons for his termination. *See id.* The memorandum stated that Plaintiff was being terminated based upon the findings from Lists's

5

investigation as well as past conduct.  The memorandum did not reference the Severance Plan nor the availability of severance pay thereunder.

On or about November 12, 2009, Plaintiff sent the Company a written request to reconsider its decision to terminate him. In a response dated November 19, 2009, Harrison affirmed the Company's decision to terminate Plaintiff. It further stated that "based upon the circumstances of your termination from the company and the fact that your position was not eliminated, you are not eligible for severance benefits or vesting of your restricted shares." Def.'s Mot. Ex. 41.

Feeling aggrieved, Plaintiff commenced this action on March 23, 2011, in Colorado district court in Mesa County.  Defendants removed the case to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1226.   Plaintiff asserts four claims of relief: (1) wrongful discharge; (2) breach of contract;  (3) violation of § 510 of ERISA, 29 U.S.C. § 1140; and (4) equitable relief pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

Defendants now move for summary judgment as to all of Plaintiff's claims pursuant to Fed. R. Civ. P. 56.

## II. Standard of Review

Under Rule 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit." *Id.* When assessing a motion for summary judgment, I must view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999).

While the movants must show the absence of a genuine issue of material fact, they do not need to negate the nonmovant's claim in order to prevail on summary judgment. *Id.*; *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997). Instead, the movants have the initial burden of demonstrating "an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). If they can do that, the burden then oscillates back to the nonmoving party to show that there is a genuine issue of material fact. *Id.* This requires more than "simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "[t]he party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Bacchus*, 939 F.2d at 891. In doing so, "[t]he nonmoving party 'may not rest upon the mere allegations or denials of his pleadings' to avoid summary judgment." *Id.* (quoting *Anderson*, 477 U.S. at 248).

### III. Discussion

Defendants move for summary judgment as to each of Plaintiff's four claims. I address the claims in turn, beginning with the wrongful discharge claim.

### A.
### Wrongful Discharge

Plaintiff's first claim is that the Company wrongfully discharged him. Defendants argue that Plaintiff fails to establish a prima facie case of wrongful discharge; therefore, the claim cannot withstand summary judgment. I agree with Defendants.

In Colorado, employment contracts are generally at-will, meaning that the employment relationship may be terminated by either party without cause, without notice, and without giving rise to a cause of action. *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo. 1987).

Colorado has, however, recognized an exception to this general rule in situations where the employer terminated the employment in violation of public policy. *See Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992). This is known as the public policy exception. *See id.* at 106. "The essence of the public policy exception is that an employee will have a cognizable claim for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy." *Id.* (internal quotations omitted). Under Colorado law, the "public policy must be clearly mandated such that the acceptable behavior is concrete and discernible as opposed to a broad hortatory statement of policy that gives little direction as to the bounds of proper behavior." *Rocky Mountain Hosp. and Med. Serv. v. Mariani*, 916 P.2d 519, 525 (Colo. 1996). "The identification of a sufficiently clear expression of public policy is an issue of law for the court." *Kearl v. Portage Envtl., Inc.,* 205 P.3d 496, 498 (Colo. App. 2008).

It is well-settled that to establish a prima facie case of wrongful discharge in violation of public policy under Colorado law, an at-will employee must present evidence of four elements: (1) the employer directed the employee to perform an illegal act as part of the employee's duties; (2) the action directed by the employer would violate a statute or clearly expressed public policy; (3) the employee was terminated as a result of refusing to perform the illegal act; and (4) the employer was aware or should have been aware that the employee's refusal was based upon the employee's reasonable belief that the act was illegal. *Lorenz*, 823 P.2d at 109.

**1**

Plaintiff appears to assert two independent bases for his wrongful discharge claim. The first is that the Company fired him for refusing to help a Mesa County Commissioner, John Meis, use

8

his public office for personal financial gain in violation of Colo. Rev. Stat. §§ 24-18-108(2)(a) and

(d).

> Sections 108(2)(a) and (d) provide that
>
> [a] public officer or a state employee shall not: (a) Engage in a substantial financial transaction for his private business purposes with a person whom he inspects, regulates, or supervises in the course of his official duties; . . . (d) Perform an official act directly and substantially affecting to its economic benefit a business or other undertaking in which he either has a substantial financial interest or is engaged as counsel, consultant, representative, or agent.

Colo. Rev. Stat. § 24-18-108(2)(a) and (d). In addition to being a county commissioner during the

relevant time period, Meis also owned an environmental consulting firm called Cordilleran, which

he later sold to Olsson & Associates ("Olsson"). Cordilleran, and then Olsson, competed with HRL

for the Company's work. Plaintiff contends that Meis used his commissionership to try and obtain

more of the Company's work for Olsson and to get Plaintiff fired for often selecting companies other

than Olsson for the Company's work. This, Plaintiff maintains, violated sections 108(2)(a) and (d).

He further contends that the Company pressured him to award Olsson more work in exchange for

Meis's political goodwill. Plaintiff maintains that this constituted a civil conspiracy to violate

sections 108(2)(a) and (d). *See McGlasson v. Barger*, 431 P.2d 778, 780 (Colo. 1967) ("A civil

conspiracy has also been defined as a combination of two or more persons by some concerted action

to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by criminal

or unlawful means."). He claims that he was fired for refusing to participate in this conspiracy.

    This argument is riddled with defects, but I need only discuss one to conclude that it fails.

Plaintiff's theory hangs on section 108(2), but that section applies only to "public officers" and

"state employees." Colo. Rev. Stat. § 24-18-102(8). Plaintiff has not shown that Meis is either. A

" '[p]ublic officer' means any elected officer, the head of a principal department of the executive

branch, and any other state officer." Colo. Rev. Stat. § 24-18-102(8).  The term explicitly excludes "any local government official," which includes county commissioners.  *See* § 24-18-102(8)*, (5) (" 'Local government' means the government of any county, . . .").  Meis is thus not a "public officer." And as a local government official, Meis is clearly not a state employee.  *See id.*  Section 108(2) therefore does not even apply to Meis.  I am troubled with how Plaintiff completely neglects this issue and ignores these definitions. Because section 108(2) did not even apply to Meis, the Company ordering Plaintiff to award Olsson more work could not have violated section 108(2).  Consequently, with respect to this theory of wrongful discharge, Plaintiff fails to establish the first and second elements of the prima facie case.  *See Lorenz*, 823 P.2d at 109.

## 2

Plaintiff's second basis for his wrongful discharge claim is the assertion that the Investigation Agreement violated public policy.  For this reason, according to him, the Company ordering him to comply with it and firing him for not doing so violated public policy.  Plaintiff maintains that the Investigation Acknowledgment violated public policy in multiple ways.

Citing *Lucht's Concrete Pumping, Inc. v. Horner*, 224 P.3d 355 (Colo. App. 2009), he argues that at the time he was given the Investigation Acknowledgment, it was illegal for an employer to impose additional conditions upon an at-will employee's continued employment unless the employer supplied consideration beyond merely refraining from terminating the employee in exchange.  He asserts that being ordered not to disclose or discuss the investigation was supported only by his continued employment. Plaintiff also argues that the acknowledgment was an "illegal and unenforceable" contract because it was impossible for him to perform. Pl.'s Resp. at 19.  He insists that it was impossible to comply with–that is, "perform"–the acknowledgment because List told him

10

that he needed to produce evidence about HRL and Olsson while simultaneously not disclosing or discussing the investigation with anyone not conducting it. Therefore, Plaintiff urges, the acknowledgment was unenforceable as a matter of law.

These arguments are specious. By focusing on the Investigation Acknowledgment, Plaintiff both distracts from and misses the mark. The prima facie inquiry of a wrongful discharge claim examines the *action* the employee undertook pursuant to his employer's direction–here, not discussing or disclosing the investigation. *See Lorenz*, 823 P.2d at 109 ("To make out his prima facie case, Plaintiff must show, among other things, that the Company directed the employee *to perform an illegal act* as part of the employee's duties; (2) *the action* directed by the employer would violate a statute or clearly expressed public policy; . . .") (emphases added). What Plaintiff must show to make out the first element of his prima facie case, then, is that the act of not disclosing or discussing the investigation was illegal. Offering no evidence or argument in support thereof, he fails to do so. These arguments therefore fail to establish the first element of a wrongful discharge claim. This is not surprising given the action's anodyne nature. Discussing the Investigation Acknowledgment only obfuscates the pertinent inquiry.

Furthermore, assuming, *arguendo*, that the Investigation Acknowledgment is of great import in the prima facie analysis, these arguments still fail. In the first instance, Plaintiff does not show that the acknowledgment was a contract as opposed to simply a written directive. Indeed, the document is titled "Investigation *Acknowledgment.*" Nowhere does it state that Plaintiff's silence regarding the investigation was in exchange for his continued employment; rather, his silence was explicitly a condition of his continued employment, one to which he could agree or disagree. In this way, the acknowledgment was more akin to a supervisor issuing a task to a subordinate. This would

unravel Plaintiff's argument.

Additionally, a closer examiner of *Lucht's, supra*, shows that Plaintiff's reliance on it is at best dubious. Contrary to Plaintiff's assertion, the case did not hold that an employer may not impose any additional conditions on an at-will employee's continued employment without offering more than continued employment in exchange. Instead, the case looked specifically and narrowly at a non-compete agreement that an employee signed after his initial hiring, and the court cabined its holding accordingly. *See Lucht's*, 224 P.3d 355 ("We are asked to decide whether the continued employment of an already existing employee constitutes consideration *for a noncompete agreement*. . . . We hold that when an employee continues his or her job without receiving additional pay or benefits *when a noncompete agreement is signed*, the agreement lacks consideration.") (emphases added), *overruled by* 255 P.3d 1058. For this reason it is questionable that the case even controls here.

More importantly, to the extent *Lucht's* does apply, the court of appeals' decision was reversed by the Colorado Supreme Court. *See Lucht's Concrete Plumbing, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011) (holding that "an employer's forbearance of the right to terminate an existing at-will employee constitutes adequate consideration to support a noncompetition agreement"). Thus, even if the acknowledgment was a contract in which the Company offered to forbear from its right to terminate Plaintiff in exchange for his promise not to disclose the investigation, that was not illegal or unenforceable. *See id.* There is also no evidence in the record that it was impossible to comply with the acknowledgment. To the contrary, there is ample evidence of information which Plaintiff gathered and supplied to List without disclosing the investigation. *See, e.g.*, Def.'s Mot. Ex. 11 at 47-52, Ex. 32-26; Def.'s Reply Ex. 1at 5-10.

Plaintiff's final argument in support of this version of his wrongful discharge claim is that directing him not to disclose or discuss the investigation violated Colo. Rev. Stat. § 8-3-106. In pertinent part, section 106 provides that "employees have the right . . . to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection."   Colo. Rev. Stat. § 8-3-106.  Plaintiff contends that under the statute, he had a right to discuss and disclose the investigation and that being directed to refrain from doing so is contrary to public policy.

Even when the facts and inferences therefrom are viewed in a light most favorable to Plaintiff, this argument is untenable.  In the first instance, Plaintiff fails to establish that the statute even applies to him because he does not show that there is a genuine dispute as to whether he was an "employee" under the statute. To be an "employee," one must work in a "nonexecutive or nonsupervisory capacity." Colo. Rev. Stat. § 8-3-104(11)(a).  Yet Plaintiff himself states that he was a "team lead" when he was terminated, and he does not dispute that he supervised five subordinates. Pl.'s Resp. at 5 ¶6; Defs.' Mot. Ex. 11 at 141-42.  The organizational chart that Plaintiff submitted corroborates these statements.  *See* Pl.'s Resp. Ex. 7 at 3. Based on this evidence, I conclude that no reasonable jury could find that Plaintiff worked in a "nonsupervisor capacity." Section 106 therefore does not even apply to Plaintiff.  Furthermore, even again assuming, *arguendo,* that Plaintiff was an "employee" under section 106, he still fails to marshal any evidence that his disclosing and discussing the investigation with co-workers was for "*mutual* aid or protection" and not just for his own.  *See* Colo. Rev. Stat. § 8-3-106. (emphasis added).  For these reasons, section 106 cannot serve as the basis for the wrongful discharge claim.

Accordingly, I conclude that Plaintiff has failed to establish a prima facie claim of wrongful discharge.  Consequently, the claim cannot withstand summary judgment.

13

**B.**
**Breach of Contract**

Plaintiff's second claim is for breach of contract. He alleges that when he was terminated, he was entitled to receive severance pay and be paid his RSUs. By refusing to give them to him, Plaintiff claims that the Company breached the Severance Plan and Award Agreements, respectively. The Company disagrees and argues that the claim cannot withstand summary judgment. I agree with Defendants in part and disagree in part.

To address Plaintiff's breach of contract claim, I must look to the Severance Plan and the Award Agreements. When doing so, my primary goal is to determine and effectuate the parties' intent. *Ad Two, Inc. v. City and County of Denver*, 9 P.3d 373, 378 (Colo. 2000). This intent is to be ascertained primarily from the language of the contracts themselves. *Id.* "Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language." *Id.*

As I elucidate *infra*, the briefs belie the claim's nuance. Plaintiff's breach of contract claim, though presented as one, is effectively two: first, a claim seeking severance pay for the Company's alleged breach of the Severance Plan; and, second, a claim seeking payment of certain RSUs for the Company's alleged breach of the Award Agreements. Furthermore, Plaintiff's claim for RSUs relates to multiple, independent Award Agreements. For these reasons, I bifurcate my analysis of the breach of contact claim. I first examine that portion of the claim seeking severance pay under the Severance Plan, then that portion seeking payment of RSUs pursuant to the Award Agreements.

**1**

Plaintiff asserts that the Company breached the Severance Plan by not paying him severance pay upon his termination. The Severance Plan provides severance benefits "for eligible employees

14

on the [Company's] U.S. payroll who are terminated because of a reduction in force, job elimination, or Change in Control of the Williams Companies, Inc." Defs.' Mot. Ex. 19 at 4. With regards to eligibility, the Severance Plan provides in pertinent part that

> [a]ny Employee, who is not excluded pursuant to Section 2.2, shall be entitled to become a Participant in the Plan only when and only if all of the following conditions of subsection (a), . . . are met:
>
> (a) The senior officer of the Company responsible for compensation or benefits, or such senior officer's designee, approves a reduction in force or job elimination and the Employee is notified in writing that employment is being voluntarily terminated due to the elimination of his position. The Employee will become a Participant on his designated termination date, provided the Employee remains in employment until his designated termination date.

*Id.* Ex. 30 at 9 ¶ 2.1(a). Importantly, an employee who meets subsection 2.1(a)'s eligibility conditions is still precluded from being a "Participant" if he was discharged "for Cause." *Id.* at 10 ¶ 2.2. "Cause" includes an "[e]mployee's willful or reckless violation or disregard of the code of business conduct or other published policy of the Company or an Affiliate." *Id.* at 3 ¶ 1.7. The Severance Plan also provided that "[p]articipation in the Plan shall not lessen or otherwise affect the responsibility of an Employee to perform fully his duties in a satisfactory and workmanlike manner." *Id.* at 17 ¶ 6.4. The "Plan shall not be deemed to constitute a contract between a Participating Company and any employee." *Id.* Nor should it be deemed "to interfere with the right of any participating Company to discharge any Employee at any time and to treat him without any regard to the effect which such treatment might have upon him as an Employee covered by the Plan." *Id.*

In their motion, Defendants argue that this portion of the breach of contract claim cannot withstand summary judgment for two reasons. The first is that Plaintiff has not established that he was eligible for severance pay under the Severance Plan because he fails to demonstrate that he was a "Participant" in it. The second is that the claim is preempted by ERISA.

15

Plaintiff does not dispute that this portion of his claim is preempted by ERISA. *See* Pl.'s Resp. 28-33. (He does, however, dispute that ERISA preempts the portion of his claim pertaining to the RSUs and the Award Agreements. I address that *infra*.). Accordingly, I conclude that ERISA preempts this portion of Plaintiff's breach of contract. I therefore grant Defendants' motion to the extent it seeks summary judgment as to this portion of the claim.

**2**

I now turn to the portion of Plaintiff's claim which asserts that the Company breached the Award Agreements by not paying Plaintiff certain RSUs upon his termination. (I note that, as previously stated, an Award Agreement was executed each time Plaintiff received RSUs. Each agreement contained essentially the same language. For this reason I feel comfortable quoting and citing just one of the agreements, the one from 2007, for my analysis.) Defendants argue that this portion of Plaintiff's breach of contract claim cannot withstand summary judgment for two reasons. First, Plaintiff has failed to show that he was entitled to be paid the RSUs under the Award Agreements upon his termination; therefore the Company's refusal to pay him the RSUs does not constitute a breach of contract. Second, ERISA also preempts this portion of the claim. After presenting the pertinent provisions from the Award Agreements, I address Defendants arguments.

The Award Agreements "g[ave] the Participant the opportunity to earn the right to receive the number of the Common Stock of the Company equal to the number of RSUs shown in the prior sentence." *See* Def.'s Ex. 28 at 3 ¶ 1 (hereinafter the "Award Agreement"). Importantly, "nothing in this Agreement . . . shall interfere with or limit in any way the right of the Company or an Affiliate to terminate the Participant's employment or service at any time, nor confer upon the Participant the right to continue in the employ of the Company and/or Affiliate." *Id.* at 6 ¶ 6(l).

16

Paragraph 4 governs the vesting of the RSUs, how the Plaintiff as the "Participant" became entitled to the payment of the RSUs. *See id.* at ¶ 4. It provides the following in pertinent part:

(a)    Notwithstanding any other provision of this Agreement, a Participant shall not be entitled to any payment of Shares under this Agreement unless and until such Participant obtains a legally binding right to such Shares and satisfies applicable vesting conditions for such payment.

(b)    Except as otherwise provided in Subparagraphs 4(c)-4(h) below, the Participant shall vest in all Shares on the date that is three years after the Effective Date (not including the Effective Date) (the "Maturity Date"), but only if the Participant remains an active employee of the Company or any of its Affiliates through the Maturity Date. . . .

*Id.* at ¶ 4(a); *see also* Def.'s Ex. 55 at 1, Email from Steven Malcolm to Plaintiff ("Subject to all of the terms of the Agreement, you will become entitled to payment of this award if you are an active employee of the Company three years after the date on which this award is made). Contrary to Plaintiff's allegations, the plain language of paragraph 4 shows that payment of the RSUs to a "Participant" was not "absolute." *See* Pl.'s Am. Compl. ¶13. Instead, to be entitled to payment of the RSUs, the Award Agreements unambiguously require one of two things: that Plaintiff continued his active employment with the Company for three years after the particular agreement's effective date or that one of the listed exceptions applies. *See* Award Agreement at 3-4 ¶ 4. The only exception at issue is subparagraph 4(g). It states that

[i]f the Participant experiences an involuntary Separation from Service prior to the Maturity Date and the Participant either receives benefits under a severance pay plan or program maintained by the Company or receives benefits under a separation agreement with the Company, the Participant shall vest in all Shares upon such separation from Service.

*Id.* at ¶ 4(g). It is clear that the parties intended subparagraph 4(g) to serve as an alternative means by which an employee could become vested in the RSUs. If an employee was not vested in the RSUs under subparagraph 4(b) because the Company terminated him before the corresponding "Maturity

Date," he could still be entitled to payment upon his termination per subparagraph 4(g) so long as he either received benefits under a severance plan, program, or separation agreement.

**(a)**

I begin with Defendant's preemption argument first, as I need not address whether Plaintiff sufficiently shows that the Company breached the Award Agreements should ERISA preempt this portion of the claim. I conclude that ERISA does not so preempt.

ERISA's conflict preemption provision states that ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any [ERISA] plan . . . ." 29 U.S.C. § 1144(a); *see also David P. Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1136 (10th Cir. 2005). Preemption is not limited to state laws specifically designed to affect employee benefit plans. *Shaw v. Delta Air Lines*, 463 U.S. 85, 98 (1983). It also encompasses common law tort and contract claims. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47-48 (1987). Thus, if a state law claim "relates to" an employee benefits plan, it is preempted by ERISA. *Id.* at 45.

ERISA's preemptive scope is "deliberately expansive" and has a "broad sweep." *Id.* at 41, 46, 47. Recognizing that "relates to" cannot reasonably be applied to its logical conclusion, however, the Supreme Court has clarified that this language must be applied "with the objectives of ERISA and the effect of the state law in mind." *David P.*, 407 F.3d at 1136 (citing *Egelhoff v. Egelhoff ex rel. Breiner,* 532 U.S. 141, 147 (2001)). These objectives are "to protect the interests of plan beneficiaries, and, in doing so, to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government by creating a uniform regulatory scheme for employee benefit plans." *Id.* (internal citations and quotations omitted). The Tenth Circuit has recognized four categories of state laws that are

18

preempted by ERISA: (1) laws regulating the type of benefits or terms of ERISA plans; (2) laws creating reporting, disclosure, funding or vesting requirements for such plans; (3) laws providing rules for calculating the amount of benefits to be paid under such plans; and (4) laws and common-law rules providing remedies for misconduct growing out of the administration of such plans. *See Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 990 (10th Cir. 1999). By contrast, if a state law claim has only a "tenuous, remote, or peripheral connection" to an ERISA plan, the claim is not preempted. *David P.*, 407 F.3d at 1136 (citing *Felix v. Lucent Techs, Inc.*, 387 F.3d 1146, 1154 (10th Cir. 2004)).

Defendants argue that ERISA preempts Plaintiff's claim that the Company breached the Award Agreements because the claim is directly related to and requires an interpretation of an ERISA plan–here, the Severance Plan. In support, Defendants explain that Plaintiff claims he is entitled to the RSUs per subparagraph 4(g) of the Award Agreements because he should have received severance pay under the Severance Plan. Assessing this claim thus requires looking to the terms of the Severance Plan to see whether Plaintiff was eligible for severance pay. Therefore, Defendants insist, this portion of the claim is preempted. Plaintiff disagrees. He argues that his claim is not preempted by ERISA because the contracts underlying this portion of his breach of contract claim, the Award Agreements, are not ERISA plans and do not "relate to" the Severance Plan.

At the outset, it is worth underscoring that this portion of the breach of contract claim alleges a breach of the Award Agreements and not the Severance Plan. It is undisputed that the Award Agreements are not ERISA plans. The inquiry turns to whether the claim "relates to" the Severance Plan. I conclude that it does not.

Defendants' entire argument rests on subparagraph 4(g) of the Award Agreements. And while they are correct that examining whether an employee is vested in his RSUs under that provision requires looking to the Severance Plan, that does not mean the claim here "relates to" it. In the first instance, Defendants cite no authority for this proposition.  Looking at the substance of this portion of Plaintiff's claim and subparagraph 4(g), neither purport to modify or otherwise alter the terms, structure, or administration of the Severance Plan.  Nor do they seek severance pay. They also do not affect the relations among the Severance Plan, the Company, or Plaintiff. In sum, they do not affect the Severance Plan or severance pay at all.  This weighs against preemption.  *See Woodworker's Supply Inc.*, 170 F.3d at 990 ("Claims that do not 'affect the relations among the principal ERISA entities, the employer, the plan, the plan fiduciaries and the beneficiaries' are not preempted."); *see also Airparts Co. Inc. v. Custom Benefit Servs. of Austin,* 28 F.3d 1062, 1065 (10th Cir. 1994) ("As long as a state law does not affect the structure, the administration, or the type of benefits provided by an ERISA plan, the mere fact that the law has some economic impact on the plan does not require that the law be invalidated.").

This is buttressed by looking at the Award Agreements more broadly. No other provision therein appears to affect, alter, or otherwise modify the Severance Plan.  *See* Award Agreement. Indeed, subparagraph 6(a) explicitly provides that payments of RSUs made under the Award Agreements do not impact the payment of benefits under an ERISA Plan. *See id.* at ¶ 6(a).  The Award Agreements also independently govern the award and payment of RSUs, which were not part of the Severance Plan.  *See id.* Moreover, it is not as though the only way for RSUs to vest was for the participating employee to receive severance pay. To the contrary, that is verily an exception to the general vesting rule, and, furthermore, is just one in a cornucopia of exceptions. *See id.* ¶ 4(a)-

20

(h). The Severance Plan is thus of practical import with respect to the Award Agreements only in rare occasions. This shows that this portion of Plaintiff's claim has, at most, only a tenuous or peripheral connection with the Severance Plan. This claim also plainly does not fit within any of the four categories of preempted claims. Preemption also would not advance the ERISA's dual objectives. The claim thus does not "relate to" the Severance Plan. Accordingly, I conclude that ERISA does not preempt this portion of Plaintiff's breach of contract claim.

**(b)**

The Company also argues that Plaintiff fails to show that he was an active employee entitled to payment of the RSUs or that he received benefits under a severance plan or program or separation agreement. Thus, Defendants conclude, Plaintiff has not shown that he is entitled to the RSUs under subparagraph 4(b) or (g), the only provisions at issue. Consequently, the Company did not breach the Award Agreements by not paying him the RSUs upon his termination. Plaintiff asserts that the fact that he did not receive one of the benefits listed in subparagraph 4(g) is immaterial. His position is that he should have received severance pay under the Severance Plan and that this triggered his entitlement to payment of 7,910 RSUs per subparagraph 4(g). *See* Pl.'s Resp. at 28; First Am. Compl. ¶ 19. I thus turn to the proffered evidence and the terms of the Award Agreements to determine whether Plaintiff has sufficiently established that he was vested in those RSUs.

To begin, I do something the parties do not: I itemize the individual Award Agreements that comprise the 7,910 RSUs in which Plaintiff claims he is vested. From my review of the parties' briefs and attached exhibits, it appears this total derives from five awards. The first is dated November 1, 2006, for 863 RSUs. *See* Pl.'s Resp. Ex. 9 at 29; Defs.' Mot. Ex. 26 at 2. The second is from February 26, 2007, for 572 RSUs. *See* Pl.'s Resp. Ex. 9 at 33-38; Defs.' Mot. Ex. 27 at 4.

The third is for 552 RSUs dated February 25, 2008. *See* Pl.'s Resp. Ex. 9 at 1; Defs.' Mot. Ex. 28 at 3. The fourth is dated August 1, 2008, for 1,148 RSUs. *See* Pl.'s Resp. Ex. 9 at 10; Defs.' Mot. Ex. 21 at 1. And the fifth is for 4,775 RSUs from a February 23, 2009, award. *See* Pl.'s Resp. Ex. 9 at 12; Defs.' Mot. Ex. 29 at 23. The sum of these awards is 7,910.  (I note parenthetically that both parties attach exhibits showing another award dated March 3, 2006, for 505 RSUs, *see* Pl.'s Resp. Ex. 9 at 2; Defs.' Mot. Ex. 20 at 2, but it appears that these RSUs are not part of Plaintiff's breach of contract claim based upon two facts: one–it is undisputed that Plaintiff was employed through their Maturity Date, March 3, 2009, and would thus seemingly be vested in them pursuant to subparagraph 4(b); two–as stated, the sum of the five enumerated awards is 7,910, the exact number of RSUs to which Plaintiff claims he is entitled. I therefore do not concern myself with the March 3, 2006, Award Agreement and its RSUs.)  I now turn to Defendants' arguments.

**(i)**

Defendants begin by arguing that Plaintiff has not shown that he is entitled to any of the 7,910 RSUs under subparagraph 4(b) because he was not employed through any of the Award Agreements' "Maturity Dates."  Certainly this is true for the 7,047 RSUs granted in the last four Award Agreements I listed, those from 2007, 2008, and 2009. The parties agree that Plaintiff was terminated on November 3, 2009, well before any of those RSUs would have vested under subparagraph 4(b). I therefore conclude that with respect to those 7,047 RSUs, Plaintiff has not established he is entitled to them under subparagraph 4(b).

The 863 RSUs awarded on November 1, 2006, however, are a different matter. *See* Pl.'s Resp. Ex. 9 at 29; Defs.' Mot. Ex. 26 at 2. Neither party addresses this issue: neither identifies these RSUs as distinctive or discusses whether Plaintiff may be vested in them under subparagraph 4(b).

The parties instead treat the 7,910 RSUs wholesale. Borrowing from the time period established for "Maturity Dates" in other Award Agreements, the 863 RSU's granted November 1, 2006, would have vested on November 1, 2009. (Neither party appears to provide the Award Agreement that corresponds to this particular RSU award. The evidence of the award is a receipt, which both parties attach, that is similar to those provided for the other awards. I thus use an Award Agreement from 2006 to estimate the "Effective Date" and "Maturity Date" for these RSUs.) For these RSUs to vest under the 2006 Award Agreement's version of subparagraph 4(b), quoted above, Plaintiff would need to be an "active employee" through November 1, 2009. (In the 2006 Award Agreement, subparagraph 4(b) from the subsequent years' Award Agreements was contained in subparagraph 4(a) but contained the exact same vesting requirements. *See* Defs.' Mot. Ex. 20 at 3 ¶4(a). For ease and clarity, I will continue to refer to subparagraph 4(b) even though with respect to the 2006 version of the Award Agreement, the provision is subparagraph 4(a).)

It is uncontroverted that Plaintiff was not terminated until November 3, 2009. While he was under investigation during the preceding month, there is no evidence or allegation that he was suspended, placed on probation or leave, or was otherwise not an "active employee" through November 1, 2009. And, importantly, for reasons that will become clear when I discuss subparagraph 4(g) *infra*, vesting under subparagraph 4(b) is not dependant upon the Severance Plan and its requirement that to be a "Participant" therein, an employee cannot have been terminated for "Cause." Viewing the evidence and drawing reasonable inferences therefrom in the light most favorable to Plaintiff, there is thus a genuine issue of material fact as to whether he was an active employee through November 1, 2009. Hence, there is a genuine dispute as to whether Plaintiff is entitled to those 863 RSUs awarded on November 1, 2006 under subparagraph 4(b). I therefore deny

Defendants' motion insofar as it seeks summary judgment as to the portion of Plaintiff's breach of contract claim seeking payment of these RSUs.

My analysis cannot end here, however, because subparagraph 4(b) is not the only provision through which Plaintiff seeks the RSUs. He also claims that he is entitled to the RSUs under subparagraph 4(g). I now turn there.

(ii)

Defendants argue that Plaintiff also fails to sufficiently establish that he is entitled to the RSUs under subparagraph 4(g). Recall that an employee becomes vested in his RSUs under that provision even if he is terminated before their corresponding "Maturity Date" if he "either receive[d] benefits under a severance pay plan or program maintained by the Company or receive[d] benefits under a separation agreement with the Company." Def.'s Ex. 27 at 5 ¶ 4(g). The parties agree that the Severance Plan constitutes a "severance pay plan" such that had Plaintiff received severance pay under that plan, he would have vested in his RSUs per subparagraph 4(g). But Defendants point out that Plaintiff did not receive such a benefit (nor any other benefit listed in subparagraph 4(g)). Plaintiff argues that whether he in fact received such a benefit is immaterial, insisting instead that, first, he should have received severance pay under the Severance Plan and, second, that this triggered his entitlement to the RSUs under subparagraph 4(g).

Putting aside whether the second part of Plaintiff's argument is true, the overall argument still fails because Plaintiff fails to adequately support the first half. To receive severance pay under the Severance Plan, Plaintiff must have been a "Participant" under section 2.1. *See* Def.'s Mot. Ex. 30 at 9 ¶ 2. As apposite here, this means satisfying the conditions of subsection 2.1(a). *See id.* To withstand summary judgment, then, Plaintiff must sufficiently show that the conditions of subsection

24

2.1(a) were satisfied. He does not.

To qualify as a "Participant" in the Severance Plan under subsection 2.1(a), "[t]he senior officer of the Company responsible for compensation or benefits, or such senior officer's designee, approves a reduction in force or job elimination and the Employee is notified in writing that employment is being voluntarily terminated due to the elimination of his position." *See id.* at § 2.1(a). In addition to arguing that Plaintiff did not receive severance pay, Defendants show that the Company's senior officer of benefits did not approve a reduction in job force or job elimination, nor did that officer's designee. Nor was Plaintiff was notified in writing that he was being terminated due to the elimination of his position. This is enough to demonstrate an absence of evidence supporting Plaintiff's assertion that he was a "Participant" in the Severance Plan. Hence, the burden shifts to Plaintiff to show that there is a genuine issue of material fact as to whether he was a "Participant." *See Bacchus, Inc.*, 939 F.2d at 891.

Plaintiff does not dispute these facts per se, yet he still asserts that his job was eliminated. In support, he adduces evidence that after he was terminated his position was not filled; his responsibilities were shifted to Mike Gardner, a coworker; and Gardner's total pay and benefits did not change. Assuming these are true, Plaintiff nevertheless fails to proffer any evidence that the requirements for becoming a "Participant" under subsection 2.1(a) were met. There is nothing before me that could lead me to reasonably infer that the Company's senior officer of benefits approved a reduction in job force or job elimination or that the officer's designee did so. An employee was entitled to become a "Participant" under that subsection "*when and only if all the* . . . conditions of subsection (a) . . . are met." *Id*. at § 2.1 (emphasis added). Thus, to purchase Plaintiff's argument, I must cast aside subsection 2.1(a)'s explicit and unambiguous requirements. This would flout basic

principles of contract interpretation. It would also require ignoring the Supreme Court's admonition against altering the terms of an ERISA plan. *See CIGNA Corp. v. Amara*, 131 S.Ct. 1866, 1876-77 (2011) ("Where does § 502(a)(1)(B) grant a court the power to change the terms of the plan as they previously existed? The statutory language speaks of '*enforc*[*ing*]' the 'terms of the plan,' not of *changing* them. . . . [W]e have found nothing suggesting that the provision authorizes a court to alter those terms . . . .") (internal citations omitted).

Defendants also argue that Plaintiff has not established that he was a "Participant" in the Severance Plan because he was fired for "Cause," as the plan defines the term. Section 2.2 of the Severance Plan provides "[n]otwithstanding the provision of Section 2.1, an Employee will not become a Participant in the Plan if . . . [the] Employee is discharged for Cause." Def.'s Mot. Ex. 30 at 10 § 2.2(a)." "Cause" includes an "[e]mployee's willful or reckless violation or disregard of the code of business conduct or other published policy of the Company . . . ." *Id.* at 3 ¶ 1.7. Defendants assert that the Company fired Plaintiff for documented performance issues and for willfully and recklessly violating both the Company's conflicts of interest policy and the Investigation Agreement, both of which were "published policies." In support thereof, Defendants proffer affidavits from Harrison and Paules, List's report, Plaintiff's termination letter, and the record of Plaintiff's performance deficiencies that Paules identified and documented in 2008 and 2009. *See* Def.'s Mot. Ex. 1 at ¶ 4 , 64 at ¶¶ 2-4, 65, 66, 69. This is sufficient to shift the burden to Plaintiff to set forth specific facts showing that there is an genuine issue as to whether he was terminated for "Cause."

Plaintiff does not dispute that he discussed and disclosed the investigation after signing the Investigation Agreement or the findings in Lists's report that he violated the Company's conflict of

interest policy. Nor does he directly dispute those performance concerns that Paules identified. Instead, he argues that he was actually terminated so the Company could placate Meis and retain his political goodwill, which, Plaintiff argues, does not constitute "Cause." He further contends that the investigation was a "sham" designed to mask this reality. In support thereof, he submits emails that Meis sent to the Company, his own deposition testimony that he was told by a Company employee that if it came to choosing between him and Meis, the Company would choose Meis, and that  List's report concluded that he had not improperly favored HRL over Olsson.  From this, Plaintiff argues, a reasonable jury could find that the Company had fired him for reasons related to Meis, which did not constitute "Cause." He was thus a "Participant" in the Severance Plan.

I conclude that a reasonable jury could not find that Plaintiff was not terminated for "Cause." Consider the evidence that supports Defendants' argument. Plaintiff indeed violated the Investigation Agreement and the Company's conflict of interest policy. His past performance issues were documented. Paules and Harrison decided to terminate him after reviewing Lists's report. Furthermore, and most troubling, there is no evidence that Meis's complaints factored into the Company's decision to fire Plaintiff. For example, there is no evidence that Plaintiff was ever told he was being fired for any reason related to Meis, and his termination letter makes no mention of Meis or Olsson and is consonant with Harrison and Paules's affidavits. *See id.* Ex 67.  To side with Plaintiff, a jury would have to determine that the totality of this evidence is outweighed by Meis's complaints to the Company and Plaintiff being told–notably not by Harrison or Paules–that "if it ever came to [him] or Meis, Meis would win." Even when this evidence is viewed in a light most favorable to Plaintiff, a rationale tier of fact could not resolve the issue of whether he was terminated for cause "either way." *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)

(citing *Anderson*, 477 U.S. at 248).   This is not only because of the overwhelming amount of compelling countervailing evidence that Plaintiff was terminated for cause, but also because Plaintiff presents no evidence connecting Meis's complaints to his termination.   Put differently, Plaintiff proffers no evidence that those complaints played a role in the Company's decision to terminate him.

Based on the above, I conclude that Plaintiff establishes only that there is some metaphysical possibility that he was a "Participant" in the Severance Plan and nothing more.   This not enough in the summary judgment stage. *See Matsushita*, 475 U.S. at 586. He thus fails to adequately establish that he is entitled to the RSUs under subsection 4(g) of the Award Agreements.

Combining my determinations here with those from Part III.B.2.i, *supra*, yields the following: I deny Defendants' motion insofar as it seeks summary judgment as to the portion of Plaintiff's breach of contract claim that seeks the 863 RSUs granted in the Award Agreement dated November 1, 2006, as a genuine issue of material fact exists concerning whether Plaintiff was an active employee through the applicable "Maturity Date, " which appears to be November 1, 2009. This means Plaintiff may be entitled to those RSUs under subparagraph 4(b). However, I grant Defendant's motion insofar as it seeks summary judgment as to the portion of Plaintiff's breach of contract claim that seeks the remaining 7,047 RSUs granted in Award Agreements from 2007, 2008, and 2009.  This is because Plaintiff fails to sufficiently show that he is entitled to those RSUs under subparagraph 4(b) or 4(g) of the Award Agreements.

## C.
## ERISA § 510

Plaintiff's third cause of action is that Defendants violated of § 510 of ERISA, 29 U.S.C. § 1140, by denying him severance pay and by ostensibly firing him for "Cause" so as to avoid doing so. Defendants argue that this claim cannot withstand summary judgment because Plaintiff fails to

show that he has standing to bring the claim and because he fails to establish a prima facie § 510

claim. I again agree with Defendants.

I begin with Defendants's first contention. In order to bring suit, a plaintiff must show that

he has standing to bring his claim or claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992). To bring a § 510 claim, this means the claimant must establish that he is a participant in,

beneficiary of, or fiduciary of an ERISA plan.  *See Mitchell v. Mobil Oil Corp.*, 896 F.2d 463, 474

(10th Cir. 1990)  ("Because Mr. Mitchell failed to prove that he was still a participant in the Plan,

it is inescapable that he did not have standing to seek enforcement of his ERISA claims[,]" which

included a § 510 claim); *see also* 29. U.S.C. § 1132(a)(3). Because standing is also a subject matter

jurisdictional requirement, *see Felix*, 387 F.3d at 1160 n.14, if a claimant lacks standing, a court

lacks jurisdiction.  *See Hansen v. Harper Excavating*, *Inc.*, 641 F.3d 1216, 1222 (10th Cir. 2011).

Thus, as threshold matter, Plaintiff must demonstrate he has standing to bring his § 510 claim.

To that end, Plaintiff contends that he was a "participant" in an ERISA plan because he was

a "Participant" in the Severance Plan. Under ERISA, "participant" means "any employee or former

employee of an employer, . . . *who is or may become eligible to receive a benefit* of any type from

an employee benefit plan which covers employees of such employer . . . ." *Felix*, 387 F.3d at 1158-

59 (quoting 29 U.S.C. § 1002(7)) (emphasis added). To establish that he "may become eligible" for

benefits, a claimant "must have a colorable claim that (1) he or she will prevail in a suit for benefits,

or that (2) eligibility requirements will be fulfilled in the future." *Firestone Tire and Rubber Co.

v. Bruch*, 489 U.S. 101, 117-18 (1989).

I already analyzed this issue in Part III.B.2.b.ii, and I incorporate that discussion by reference

here. *See* Part III.B.2.b.ii, *supra*. Because I do so, I offer only a brief summary of that analysis.

Subsection 2.1(a) of the Severance Plan delineates the requirements for becoming eligible for severance pay–that is, for becoming a "Participant" in the plan. Plaintiff failed to proffer evidence satisfying those requirements. Section 2.2 of the plan provided that if an employee was terminated for "Cause," he could not be a "Participant" even if all of subsection 2.1(a)'s requirements were satisfied. Plaintiff did not marshal specific facts with which a reasonable jury could find that he was not terminated for "Cause." For these reasons, I concluded that Plaintiff failed to adequately demonstrate that he was a "Participant" in the Severance Plan. He therefore cannot show that he "is or may be eligible" for severance pay. Consequently, he does not establish that he is a "participant" under ERISA, which means he does not have the standing necessary to bring his § 510 claim.

Assuming, *arguendo*, that Plaintiff does have standing as a participant, the claim nevertheless fails on other grounds. Section 510 makes it "unlawful for an for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." *Apsley v. Boeing Co.*, 691 F.3d 1184, 1207 (10th Cir. 2012) (citing 29 U.S.C. § 1140). It "prevent[s] unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested [ERISA-protected benefits] rights." *Id.* (internal quotations omitted). "A section 510 claimant must establish that the employer's alleged desire to block the attainment of benefits rights was a determinative factor in the challenged decision." *Id.* (internal quotations omitted).

Courts addressing § 510 cases have employed the analytical framework for proving discriminatory intent in Title VII cases. *See e.g.*, *Apsley*, 691 F.3d at 1207. Under that framework, a § 510 claimant must first establish a prima facie § 510 claim. To do so, the claimant must demonstrate (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the

attainment of any right to which he may become entitled. *Id.* If the plaintiff-employee meets this burden, the employer must produce admissible evidence of legitimate, nondiscriminatory reason for its challenged actions. *Id.* The plaintiff then must demonstrate that this reason was pretextual. *Id.*

Plaintiff fails to make the prima facie showing. As discussed above, he does not demonstrate that he may become entitled to severance pay under the Severance Plan, the third element. He also fails to establish the second. He repeatedly, consistently, and unequivocally contends that the Company terminated him to appease Meis–not that it did so to avoid paying him severance pay. *See, e.g.*, Pl.'s Resp. at 2 ("In actuality, Williams eliminated Plaintiff's position to preserve a political and financial relationship with Mesa County Commissioner, Craig Meis."); *id.* at 26-27 ("Here, the record contains sufficient evidence to establish a *prima facie* case under § 510. As discussed previously, there is evidence that Commissioner Meis urged Williams to fire Plaintiff because he was upset that Plaintiff was using HRL instead of Olsson. . . . Based on this evidence, a reasonably jury could infer that Williams actually fired Plaintiff to maintain its relationship with Commissioner Meis."). Additionally, and more importantly, Plaintiff submits no evidence (aside from his own testimony) supporting the assertion that the Company fired him to interfere with his severance pay. Clearly that is fatal when trying to survive summary judgment. *See, e.g.*, *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 347 (3d Cir. 1990) ("To recover under § 510 the employee must show that the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or greater benefits.").

Even if Plaintiff established the prima facie case, the claim still could not survive summary judgment. Defendants have produced admissible evidence of legitimate, nondiscriminatory reasons for terminating Plaintiff. They explain that the Company terminated him for poor performance and

for violating Company policies. They support this contention with, among other things, Plaintiff's documented performance issues, Harrison and Paules's affidavits, Lists report, and Plaintiff's termination letter.  This shifts the burden back to Plaintiff to show that these reasons are pretextual.

To show pretext, Plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [interfering with his ERISA-protected benefits]." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011). He may establish pretext by "introducing affirmative evidence of a discriminatory motive, or by showing that [the Company's] proffered explanation is unworthy of credence." *Id.* (internal citations and quotations omitted). Plaintiff need not, however, prove that interfering with his severance pay was the sole reason for his firing; rather, he need only show that it was a "determining factor." *Id.* He fails to do so.

Plaintiff's pretext argument has three parts and is as follows. He first cites the evidence pertaining to Meis's complaints and he urges that based upon it "a reasonable jury could infer that Williams actually fired Plaintiff to maintain its relationship with Commissioner Meis." He then contends that certain aspects of the investigation and the Company's treatment of other employees shows that the Company's reasons for terminating him are pretextual. Pl.'s Resp. at 27.  He submits that the investigation was initiated by Matar, whose work was unrelated to his own. Plaintiff further points out that Lists's report concluded that he had not inappropriately favored HRL. Further, he alleges that other employees who had engaged in conduct similar to his own were not terminated or even disciplined. From this, Plaintiff argues that a jury could find that the Company instituted the investigation as a sham to obfuscate its desire to appease Commissioner Meis and to create a pretext to terminate Plaintiff.  He lastly argues that from this pretext, a jury could infer that the Company

took these actions, at least in part, with the specific intent of denying Plaintiff the severance benefits to which he was lawfully entitled.

This argument does not merit much analysis. With respect to the first part, I already concluded that no reasonable jury could conclude that Plaintiff was not terminated for "Cause." And even if he was terminated for reasons related to Meis, that would imply that the Company did *not* terminate him to avoid paying him severance pay, which is what Plaintiff must establish here. Turning to the second part of the argument, Plaintiff again plays fast and loose with his own allegations and facts. There is no evidence that Matar initiated the investigation; Plaintiff alleges that Matar merely lodged a complaint. Moreover, even if Matar had initiated the investigation, that does not by itself raise a genuine issue of fact concerning the investigation's *bona fides*, particularly in light of the investigation's conclusion. Two of those conclusions, which Plaintiff conveniently ignores while citing others, is that he violated the Company's conflict of interest policy and the Investigation Acknowledgment. Plaintiff's allegations concerning disparate treatment are also misleading for the reasons sets forth in Defendant's reply. *See* Def.'s Reply at 6-7. Moreover, Plaintiff was an at-will employee; to think that the Company would exert the time and resources to create a month-long facade investigation complete with document review and interviews by an experienced investigator and assessor of conflicts of interest when it could legally fire Plaintiff for any reason or no reason, including Meis's displeasure, is unreasonable.

But the most defective part of Plaintiff's argument is the last, the one that goes to the heart of the pretext argument. Plaintiff would ask the jury to make an inference based on an inference based on an inference–that based on Meis's complaint and the quoted comment, a jury could infer he was fired for reasons related to Meis; from this a jury could infer that the investigation was a

"sham" so the Company could manufacture a reason to terminate Plaintiff even though it was perfectly within its legal right to so; and based on that a jury is could infer that the Company terminated Plaintiff to avoid paying him severance.  This is far too tenuous, and it is compounded by the fact the first two inferences are faulty for the reasons I have discussed.  Furthermore, as stated, Plaintiff presents no evidence that not paying him severance was a factor the in the Company's decision to terminate him, let alone a *determining* factor.  None.  There is also an abundance of evidence to the contrary. What he is essentially arguing, then, is that it is possible that some unspecified, unidentified specter may have had a role in his firing, and that in spite of both overwhelming competing evidence and nonexistent supporting evidence, a jury seance could conjure this specter and divine that it was the Company's desire to avoid paying him severance pay. But showing pretext requires more than poltergeists and possibilities. It also requires more than establishing that the proffered reasons for his termination were pretext for *something*.  Showing pretext requires Plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were a pretext for the specific purpose of interfering with his ERISA-protected benefits.  *Carter*, 662 F.3d at 1149.  He fails to do so.

Accordingly, for the reasons above, I conclude that Plaintiff's § 510 claim cannot withstand summary judgment.

### D.
### ERISA § 502(a)(3)

Plaintiff's fourth and final claim against Defendants seeks equitable relief pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). Defendants again assert that Plaintiff lacks standing to bring this claim because he fails to establish that he was is a "Participant" under the Severance Plan and therefore was not a "participant" as defined by ERISA.  I already addressed this issue, and

for the reasons I previously discussed, I conclude that Plaintiff indeed lacks standing to bring this claim. Consequently, the claim cannot withstand summary judgment.

## IV. Conclusion

For the foregoing reasons, IT IS ORDERED that Defendants' Motion for Summary Judgment and Supporting Brief **[Doc #55]** is DENIED to the extent it requests summary judgment as to the portion of Plaintiff's breach of contract claim against the Company seeking the payment of the 863 RSUs awarded on November 1, 2006, but the rest of the motion is GRANTED.  Because the Plaintiff's surviving claim is asserted only against the Company, IT IS FURTHER ORDERED that the Severance Plan is dismissed from the case.

Date: November __30__, 2012 in Denver, Colorado.


BY THE COURT:


___s/Lewis T. Babcock_____
LEWIS T. BABCOCK, JUDGE